ESTATE OF MARY WEBB CLEVELAND, DECEASED; FIRST ALABAMA BANK OF TUSCALOOSA, N.A., A National Banking Association, Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cleveland v. Commissioner
Docket No. 15425-79
United States Tax Court
T.C. Memo 1983-227; 1983 Tax Ct. Memo LEXIS 571; 45 T.C.M. (CCH) 1403; T.C.M. (RIA) 83227; April 25, 1983. J. William Lewis,John C. Coggin,III, and F. Gerald Burnett, for the petitioner. Robert W. West, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the estate of Mary Webb Cleveland, Deceased, First Alabama Bank of Tuscaloosa, N.A., executor, in the amount of $348,121. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) Whether decedent was the actual owner of assets held in the name of the Webb Trust, which assets were purchased by the trust with funds that belonged to decedent, so that decedent's pro rata share of the assets acquired by the trust with her funds are includable in her gross estate under section 2033; [1] and (2) whether decedent during her life made transfers of funds belonging to her to the trust so that a pro rata share of the assets acquired by the trust are includable in her gross estate under section 2036. *573 FINDINGS OF FACT First Alabama Bank of Tuscaloosa, N.A., executor of the estate of Mary Webb Cleveland, filed a Federal Estate Tax Return with the Internal Revenue Service Center, Chamblee, Georgia on August 13, 1976. First Alabama Bank of Tuscaloosa, N.A., is a national banking association and at the time of the filing of the petition herein maintained its principal place of business in Tuscaloosa, Alabama. The decedent, Mary Webb Cleveland, died testate on August 15, 1975, at the age of 57.At the time of her death, decedent resided in Eufaula in Barbour County, Alabama. Decedent died leaving no children surviving her. At the time of her death, decedent was survived (1) by her husband, Grady G. Cleveland, Jr., (2) by her two brothers, C. A. Webb, Jr. and J. C. Webb, (3) by her two sisters, Katherine Webb Holmes and Elizabeth Webb Arbuthnot, (4) by her nephew, Charles Allison Holmes, and (5) by her two nieces, Mary Elizabeth Holmes and Mary Katherine Arbuthnot Avery. Charles Allison Holmes and Mary Elizabeth Holmes are the son and daughter of decedent's sister Katherine Webb Holmes. Mary Katherine Arbuthnot Avery is the daughter of decedent's sister Elizabeth Webb Arbuthnot. *574 Prior to her death, decedent had been a beneficiary and trustee of a trust established by her mother known as the Webb Trust. Decedent's mother, Mary Elizabeth Webb, had established and created the Webb Trust for the benefit of her lineal descendants by executing a trust indenture on July 15, 1940. Decedent's mother named the decedent and decedent's four brothers and sisters as co-trustees and beneficiaries of the Webb Trust (decedent together with her siblings are hereinafter sometimes referred to collectively as the Webb children; decedent's two brothers are hereinafter sometimes referred to collectively as the Webb brothers, and decedent and her two sisters are hereinafter sometimes referred to as the Webb sisters). The trustees of the Webb Trust, who when the trust was established were the five children of Mrs. Webb, were given broad powers of management under the trust instrument. The trustees were authorized to lease or improve the trust property in any manner and upon any such terms and conditions as they might deem advisable. The trustees were further authorized to sell or exchange any of the trust property at any time for such considerations as they might deem to *575 be in the best interests of the trust. They could retain as an investment any part or all of the trust property conveyed to them for and in the best interest of the trust, as they as trustees in their sole discretion might deem advisable. They were authorized to invest trust funds in whatever securities or investments they deemed advisable, whether or not such investments were authorized by either the laws of the State of Alabama or by the rules of practice of any court having jurisdiction over the trust. The trust instrument stated that any determination by the trustees as to what receipts constituted income or principal and as to what losses and expenses constituted charges to income or charges to principal, was to be final and conclusive as to all persons interested in the trust.The trustees were not required to pay any interest on any funds in their custody while awaiting investment or a distribution. The trust instrument contained the following provision concerning the authority granted the trustees to distribute the income and principal of the trust: The Trustees shall have the power, right and authority, in their sole discretion, to determine at what times a distribution *576 of the trust property and of the net income therefrom shall be made to the beneficiaries of this trust, and shall have the further right, power and authority, in their sole discretion, to determine the total amount of distribution that shall be made from time to time to the beneficiaries of this trust and may, in their discretion, make distribution to the beneficiaries of this trust not only of the net income of the trust but also of such part of the principal of the trust property as to the Trustees may appear expedient and wise. The trustees were further authorized to pay themselves reasonable compensation for their services and also to reimburse themselves for any expenses and expenditures incurred which they deemed to be reasonably necessary in the administration of the trust. The initial beneficiaries of the trust were the five children of Mrs. Webb. The beneficial interests of the five Webb children were equal, and any distributions made by the trustees to the beneficiaries were to be equal in amount, whether or not such distribution was made from net income or from principal. Upon the termination of the trust, the interests of the Webb children in the trust property *577 were to be equal. The trust instrument contained the following pertinent provisions as to who would succeed to the beneficial interest of any of the Webb children in the event that such beneficiary-child died prior to the termination of the trust: If any one or more of the above named beneficiaries of this trust should die prior to the termination of this trust and should leave surviving any child or children of said deceased beneficiary, then said surviving child or children of said deceased beneficiary shall have and take the share of the trust property and the share from the distributions from said trust property that otherwise would have been payable to the deceased beneficiary if the said deceased beneficiary had lived. In case any one or more of the above named beneficiaries should die prior to the termination of the trust and should leave surviving more than one child, then the said children of said deceased beneficiary shall take, share and share alike, that part and portion of distribution from said trust property and that share and portion of said trust property which said deceased beneficiary would have received if said beneficiary had lived. In like fashion, if any *578 one or more of the above named beneficiaries should die before the termination of this trust, and should leave surviving a child or children, or a child or children of a deceased child, or if, following the death of said beneficiary and while this trust is in force, a child or children of said deceased beneficiary should thereafter die and leave surviving child or children, then in such case said surviving grandchild or grandchildren of said beneficiary shall take and have, share and share alike, the part or portion of said disbursements from the trust property and final distribution of said trust property which would have been received by the deceased father or mother, as the case may be (said deceased father or mother being, of course, a child of the deceased original beneficiary).In case one or more of the above named beneficiaries should die prior to the termination of this trust and should not leave surviving any child or children, then in that case the remaining beneficiaries hereinabove named shall take, share and share alike, the interests of said deceased beneficiary in and to disbursements from the trust property and in and to the final distribution of said trust property.
*579 The five trustees were to act basically by majority vote. The signatures of at least three trustees were needed on any Deed of Conveyance, contract for the sale or lease of any real property of the trust or on any mortgage or any note of the trust, so long as there were five trustees. However, any trustee could be authorized to act for the trust in purchasing personal property in an amount not exceeding $2,000 or in employing help or labor or employees in conducting the business of handling or using the trust property or carrying on the business incidental to the conduct of duties or powers of the trustees. Upon the death or resignation of a trustee, a new trustee would not be appointed to replace the deceased trustee. Instead, the remaining trustees were to have and exercise full powers with respect to the trust property and to conduct all business pertaining to the trust property as well as to exercise all powers and authority granted to them under the trust instrument. The Webb Trust was to continue as long as any one of the five Webb children lived and continued to act as a trustee of the trust. The trust instrument expressly permitted the trust to be terminated under *580 the following circumstances: Upon or after the death of any of the Trustees herein named, the trust herein created may be ended by the consent of the remaining Trustees and by the consent of all beneficiaries of the trust who are at said time sui juris, said consent to be evidenced in writing, duly signed and acknowledged in accordance with the laws of Alabama at the time in force regulating the execution and acknowledgment of conveyance in real estate, and said consent in writing so executed and acknowledged shall be filed for record in the office of that public official in Perry County, Alabama, in which it may then be required by law that conveyances of real estate shall be recorded in order to constitute constructive notice thereof. Upon the termination of this trust, title to any and all trust property remaining shall thereupon immediately vest in beneficiaries of this trust, as the said beneficiaries may be and exist (in accordance with other provisions hereof) at the time of the dissolution of the said trust. The books and records of account of the Webb Trust were originally set up in 1940 by E. L. Harris. Mr. Harris is a public accountant who has practiced over the years *581 out of Birmingham, Alabama. The books of the trust consisted of a general journal which was physically maintained by a bookkeeper in Marion, Alabama, and a general ledger maintained by Mr. Harris in his office in Birmingham. Since the creation of the Webb Trust in 1940 and through the date of decedent's death on August 15, 1975, Mr. Harris reviewed and examined the general journal maintained in Marion, Alabama, and maintained or supervised the maintenance of the general ledger. Prior to January 1, 1968, a separate account was established and maintained by Mr. Harris in the general ledger for each of the Webb children. Upon the creation of the Webb Trust in 1940, the first entry made to the account of each of the five beneficiaries of the trust was a credit in an amount equal to one-fifth or 20 percent of the corpus of the trust. All trust income realized by the trust from its creation through December 31, 1967, was properly allocated among, entered on and credited to the separate accounts maintained in the general ledger for each of the five children of Mrs. Webb, pro rata, as beneficiaries of the Webb Trust. The income, however, was not actually physically distributed to the *582 beneficiaries at the time of crediting, but remained in the trust. The Webb Trust filed U.S. fiduciary tax returns (forms 1041) for each year subsequent to its creation in 1940.These tax returns filed by the Webb Trust reflected that the entire annual income of the trust had been distributed in equal amounts to the five children of Mrs. Webb as income beneficiaries of the trust. Each of the Webb children correspondingly reported in his or her individual income tax return for each year his or her one-fifth share of the annual income of the Webb Trust all of which had been shown as distributed to the beneficiaries by the trust on the form 1041 it filed for such year. In 1966 or 1967, the two Webb brothers retained an attorney to plan their respective estates.The attorney in the course of doing this estate planning inquired as to the precise amount of the funds each brother had allowed the Webb Trust to retain, since such funds would be includable in their respective estates. In these discussions between the attorney, the two Webb brothers and Mr. Harris, the accountant for the trust, it was suggested that principal accounts and income accounts be stated separately in the general *583 ledger. An entry was made by Mr. Harris, the accountant for the trust, effective January 1, 1968, which resulted in the creation of two separate accounts in the name of each of the Webb children. These accounts were designated by Mr. Harris as income accounts and principal accounts. The entry made effective January 1, 1968, separated and withdrew the amount of trust corpus standing in each of the general ledger accounts of the Webb children which had been transferred to the Webb Trust by Mrs. Webb. The same amount of corpus was entered in each of the new principal accounts of the five Webb children. Each of these principal accounts was comprised of one-fifth or 20 percent of the property in the Webb Trust which had been transferred to the trust by Mrs. Webb. Thus, effective January 1, 1968, the general ledger accounts of the Webb children from which amounts constituting trust corpus had been removed, constituted income accounts. These income accounts were maintained in the name of each of the Webb children. The respective income accounts were comprised of trust income credited, allocated and taxed to the respective five beneficiaries of the Webb Trust and remaining in trust *584 at the time of crediting for each year, but less debits for all withdrawals made from the account by the respective beneficiary. The trust income realized by the Webb Trust for 1968 and each year thereafter continued to be properly allocated among, entered on and credited to the income accounts of the Webb Children, pro rata, as beneficiaries of the Webb Trust. However, there was never a physical payment of such trust income to the beneficiaries at the time of crediting but such income remained in the trust. For example, for calendar year 1972 the trust reported income in the amount of $129,907.49 and distributions to beneficiaries in that same amount with no taxable income being reported with respect to the Webb Trust itself. The $129,907.49 was allocated among, entered on and credited to the income accounts of the Webb Children as follows: Name of Beneficiary
Amount Credited
C. A. Webb, Jr.
$ 25,981.50
J. C. Webb
25,981.50
Elizabeth Webb Arbuthnot
25,981.50
Katherine Webb Holmes
25,981.50
Mary Webb Cleveland
25,981.49
$129,907.49
Each of the five beneficiaries continued to report on his or her individual income tax return his or her 20 percent *585 share of the annual income of the Webb Trust. The trust on its own income tax return continued to report all annual income as being entirely distributed to the beneficiaries. Although the annual income of the Webb Trust continued to be shown each year as distributed to the beneficiaries and each of the beneficiaries continued to report his pro rata share of distributed income on his own individual income tax returns, the practice of the income not being physically distributed to or withdrawn by the beneficiaries continued. Until 1968, the respective general ledger accounts maintained in the names of the Webb Children showed the cumulative balance of income due to the respective beneficiaries but which had not been physically withdrawn. For 1968 and thereafter, such amounts of trust income remaining in the trust were shown in the respective income accounts of the Webb Children. No interest was paid to a beneficiary for the funds used by the trust and not physically withdrawn by the beneficiary. No written promissory notes were executed by the trustees with respect to trust income not physically withdrawn by the beneficiaries. Distribution of the entire annual trust income was *586 authorized each year by the trustees. Withdrawals of trust income properly credited and allocated to the beneficiaries occurred at least annually over the years (1) when a beneficiary requested funds or wrote a check on one of the trust's bank accounts at the Marion Bank and Trust Company or (2) when merchandise was purchased by a beneficiary from a country store owned and operated by the trust. The Webb Children would from time to time write checks on the funds of the Webb Trust on deposit at the Marion Bank and Trust Company in Marion, Alabama. These checks were honored by the Marion Bank and Trust Company with the signature of only one of the Webb Children. Over the years, checks were written by each of the Webb Children. Each check drawn on the trust's bank account by any of the Webb Children for personal purposes was treated as a reduction to the aggregate cumulative balance of such child's share of total trust income previously credited to him or her. The country store owned by the trust sold groceries and other sundry items. At different times certain of the Webb children would make purchases at this store which they would charge to their names. Each such purchase *587 made by any of the children would be treated as a reduction to the total balance of trust income which had been credited or allocated to him but which remained in the trust. The unwithdrawn trust income over the years was used to operate the trust. A large part of the trust's property consisted of farmland. The unwithdrawn income was used to pay different expenses in conducting farming operations on these lands. Additionally, the trust at various times acquired title to additional properties, including additional farmland, pasture and timberland. Most of such acquisitions were financed by the trust by obtaining loans from the Federal Land Bank. The unwithdrawn trust income would also be used to make payments on these loans. The two Webb brothers for the most part handled the day-to-day management of the property held by the trust. However, all of the Webb children did meet together at least once a year. Important trust business such as the making of additional capital acquisitions would be discussed among the children at these annual meetings. Additionally, the Webb children would consult informally at other times with one another about matters concerning or affecting *588 the trust. For instance, the children all paid their personal individual Federal income taxes for each year by way of drawing checks for the amounts they owed on the trust's checking account. Each of the Webb sisters, prior to drawing such a check, would inform one of her brothers of the amount the check would be for, so that the brother could see that sufficient funds were in the checking account to cover the check. The amount of any such check, since it was for a personal expense, would be charged against the particular beneficiary's cumulative balance of unwithdrawn trust income. The aggregate withdrawals made by any of the Webb children never exceeded at any time the cumulative balance of Webb Trust income which had previously been credited and allocated to him on the books at the trust. The two Webb brothers had businesses of their own and did not need the amounts left with the trust to live on. None of the three Webb sisters needed the income from the trust to live on, since each had married a husband who earned sufficient income with which to support his family. On two occasions, however, two of the Webb sisters each made a withdrawal to be used in connection with the *589 purchase of a new house. In 1968 Mrs. Cleveland, the decedent, made withdrawals for the year totaling $17,138.20 in connection with a house she had purchased, whereas her pro rata share of income of the trust which had been credited to her account for the year was $11,599.50. Beginning in 1968 each of the Webb sisters began to make monthly withdrawals in the amount of $200. As of December 31, 1974, the general ledger of the Webb Trust showed that each of the Webb children had in his or her income account the following amounts: Amount
C. A. Webb
$209,004.47
J. C. Webb
176,478.28
Elizabeth Webb Arbuthnot
189,688.04
Mary Webb Cleveland
201,411.56
Katherine Webb Holmes
207,605.21
Mrs. Cleveland, the decedent, in her last will dated May 13, 1975, directed that a trust be established for the benefit of her husband if he survived her. Under this trust to be established Mr. Cleveland would have the use of the house which decedent used as her residence and the income for life from certain other assets, which consisted of two pieces of rental real property and $50,000 cash. The trustee of this trust for Mr. Cleveland, however, was granted the discretion to *590 invade the trust principal if necessary to meet the reasonable needs of Mr. Cleveland. Upon the death of her husband, the principal remaining in the trust was to be transferred by the trustee free of the trust to the residuary beneficiaries of decedent's estate. All the rest of decedent's property, except for certain furniture and household goods, was to be disposed of as part of her residuary estate. This residue was to be shared equally by decedent's nephew, Charles Allison Holmes, and her two nieces, Mary Elizabeth Holmes and Mary Katherine Arbuthnot Avery. The father of decedent's niece, Mary Katherine Arbuthnot Avery, was an attorney. Prior to decedent's death, Mr. Arbuthnot had maintained in discussions with Mr. Harris and the Webb brothers that when the Webb Trust was eventually terminated on the death of the last of the five original beneficiaries, his daughter would be entitled to one-half of the property in the trust whereas her two cousins each would be entitled to a 25 percent share of the trust property. The Webb brothers subsequently consulted with an attorney with respect to the validity of this contention. As of August 15, 1975, the date of decedent's death, *591 there was a total of $202,975.45 in the decedent's income account in the Webb Trust which had not been physically withdrawn by her. This $202,975.45 unwithdrawn portion of decedent's cumulative balance of trust income, as of the date of her death, was included in her estate on the estate tax return. Respondent in the notice of deficiency increased decedent's estate because of his determination that the trust assets at the date of decedent's death acquired with income credited to her account but retained by the trust should have been reported in the estate tax return. Respondent determined that the gross estate should be increased by $357,803.00 because of this adjustment with the following explanation: It has been determined that the income reported as distributed to the decedent during the term of the Webb Estate Trust was in fact retained by the trust which purchased additional assets with the retained income.Therefore, the fair market value the decedent's pro rata share of the additional assets pourchased by the trust is included in the gross estate. See Exhibit B and C for computrations of the amount to be included. Accordingly, the taxable estate is increased $357,803.00. *592 OPINION Respondent takes the position that 17.27 percent of the value of the property held by the Webb Trust on the date of the decendent's death other than that contributed to the trust by the settlor, Mrs. Webb, is includable in decedent's estate. [2]
Respondent advances two theories in support of including such percentage of the property in decedent's estate. The first theory of respondent is that, in using retained income which *593 belonged to decedent to acquire property, the trust was merely acting as nominee for decedent or acting in such a manner that a purchase money resulting trust arose in decedent's favor in the acquired property. Respondent in advancing this theory is essentially arguing that, although nominal title to the property was held by the trust, the actual owner of the acquired property was the decedent. Respondent's second theory in support of his contention that an undivided percentage of the property owned by the trust is includable in decedent's estate, is that decedent by allowing the trust to retain the income annually distributed to her made transfers back to the trust of her funds in such a manner as to cause section 2036 to be applicable. It is petitioner's position that decedent made bona fide loans of the funds retained, which were payable back to her on demand and after her death payable to her estate, so that no greater amount than the $202,975.45 balance in decedent's trust income account on the date of her death is includable in her estate. Thus, the dispute between the parties is whether in fact the decedent made loans to the trust of the trust income reported on the trust *594 return and on her own individual return as distributed to her but retained and used by the trust. It is clear that the trust for each year did not execute notes to each of the individual beneficiaries of the amount of the unwithdrawn share of the annual trust income which each beneficiary has allowed the trust to retain.
Whether the trust was allowed to use funds belonging to decedent pursuant to loans is a question of fact. Beaver v. Commissioner,55 T.C. 85, 91 (1970); Fisher v. Commissioner,54 T.C. 905, 909 (1970); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). The determinative fact is whether a bona fide debtor-creditor relationship existed. In order for such a debtor-creditor relationship to have arisen, both parties to the transaction, at the time the funds were furnished, must have had an actual intent to establish such a relationship. Fisher v. Commissioner,supra at 909 to 910; Haber v. Commissioner,supra at 266. Petitioner *595 at trial offered the testimony of the three living Webb children and also the testimony of Mr. E. L. Harris, the accountant for the trust. These witnesses acknowledge that they did not label the accumulated funds the trust was allowed to retain as loans. However, they each testified that the funds in each individual beneficiary's account were his funds which he or she was free to withdraw as he or she wished. The Webb children stated that they viewed these accounts as "their money" and like "another bank account." Mr. Harris specifically stated that he considered the retained income as loans. The witness-beneficiaries all stated that none of them had intended to make a gift of such funds to the trust and that the trust was not entitled to keep the money and did have an obligation to pay such money to the individual beneficiary on demand. Mr. Harris, the accountant, testified that it had been tacitly understood by him and all the Webb children that the trust would distribute all of its current net income to the Webb children and that each of the children would report his or her pro rata share of the trust income on his or her own individual income tax return. Each of the Webb *596 children testified that his allowing the trust to use any of the unneeded accumulated funds in his account obviated the trust's needing to borrow money with which to operate. There is also other evidence of record corroborating the testimony of these witnesses that the funds which the trust was allowed to use over the years were furnished to it by the Webb children as loans. On the books maintained by the trust, careful account was kept of the cumulative balance of distributed income which a beneficiary had allowed to accumulate and be used by the trust. Any withdrawals made by a beneficiary resulted in a reduction to the cumulative balance in his or her individual account. Further, each of the Webb brothers long before the present controversy arose viewed the funds in his account as money belonging to him which if remaining in such account at his death would be included in his estate. We do not accept respondent's contention that there was no intention that the money be repaid. While no formal notes were executed, the trust on its books kept an accurate record of the funds which each beneficiary had not withdrawn but had allowed the trust to retain and use. Although no *597 interest was ever paid by the trust to a beneficiary, in our view the lack of any payment of interest is not fatal to the transaction's being classified as loans. The Webb children were brothers and sisters who were very close to one another. It is not uncommon for closely related family members to loan money to one another interest free. The funds that the Webb children allowed the trust to retain were used by the trust primarily either to conduct annual operations on its farm properties or to help pay loans on additional properties acquired by the trust. The funds furnished therefore would likely result in increased annual income being produced, which would be equally shared by all the Webb children in their capacities as beneficiaries of the trust. Since only close family members were involved, the fact that at times somewhat larger amounts of the funds being used interest-free by the trust were supplied by one sibling than by certain others is not unusual. The record also shows that the Webb children all lived rather frugally and through the years each made few sizeable withdrawals of funds from his or her individual account. As of the date of decedent's death, the balances *598 in the individual accounts, though of differing amounts, were not greatly disproportionate. At December 31, 1974, decedent's account had a $201,411.56 balance; her two brothers, C. A. and J. C. Webb, had in a balance of $209,004.47 and $176,479.28, respectively, and her two sisters, Elizabeth Webb Arbuthnot and Katherine Webb Holmes, had a balance of $189,688.04 and $207,605.21, respectively. Yet, whenever a beneficiary had a particular need for funds a withdrawal was made. For instance, both decedent and one of her sisters at different times purchased a new house and made withdrawals of funds. In decedent's case, her withdrawals in the year she purchased a house substantially exceeded her pro rata share of that year's current net trust income. Also, in later years when the Webb sisters decided that they wanted to have more spending money of their own, each made a monthly withdrawal of $200. Respondent further argues that, while a beneficiary may have had the right during his or her lifetime to withdraw funds credited to his or her account, the beneficiaries never really intended to enforce any obligation of the trust to repay the funds that it used. Respondent contends that *599 but for the present controversy arising, each of the beneficiaries would have simply allowed the funds credited in his account to stay in the trust and not be part of his estate. Such contention is directly contradicted by the testimony of petitioner's witnesses discussed above. Further, upon examination the record does support the inference that decedent intended that the balance in her account be paid to and become a part of her estate. Under the trust indenture, which we quoted in detail in our findings, if not earlier terminated, the Webb Trust would terminate as of the date upon which the last of the Webb children died. At that time the trust property would be divided between decedent's nephew and two nieces. However, under the trust provisions the share of the nephew and niece who were brother and sister might well be disproportionate to that of the niece who was an only child. From decedent's last will it is apparent that in disposing of her own property decedent intended to treat her nephew and each of her two nieces equally, with each receiving one-third of her residuary estate. In fact the record shows that decedent at the time of making her last will was in the hospital *600 and called Mr. Harris to come consult with her about the provisions of her will. She particularly wanted to know the funds available in her income account with the trust in considering the amount to be placed in a trust for the benefit of her husband. After weighing the evidence presented, we conclude that decedent did intend that the trust repay to her the money that she allowed it to use by not withdrawing funds credited to her account and that the trust, through its trustees, did intend to make such repayment. The failure of the parties to the transactions to denominate the account of the beneficiaries as loans does not require a conclusion that they were not loans where there is an actual intent by the parties that the money advanced be repaid. Cf. Berthold v. Commissioner,404 F.2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Commissioner v. Makransky,321 F.2d 598, 600-601 (3d Cir. 1963), affg. 36 T.C. 446 (1961). We find that funds which decedent allowed the trust to use were furnished pursuant to loans which were repayable on demand by her. Our finding that the transactions were loans largely *601 disposes of the two theories advanced by respondent for including a greater amount in the estate than had been reported on the estate tax return by petitioner. The funds borrowed by the trust were its funds. No resulting trust would arise in decedent's favor in any of the property acquired by the trust through the use of such borrowed funds. A resulting trust cannot arise where the money used to purchase the property was furnished as a loan to the person taking title to the property. Noland v. Sanders,273 Ala. 459, 142 So.2d 883, 885 (1962). See Bogart, Trusts and Estates 455 (2d ed. 1977). [3]
The evidence of record is directly contrary to respondent's contention that the trust acquired property merely as a nominee *602 of decedent. It is quite clear the trust acquired different assets for its own purposes, rather than as a mere nominee of decedent. The testimony offered by petitioner at trial showed that one of the major acquisitions made by the trust subsequent to its creation was an additional tract of timberland.The timber on the tract, unlike the timber on the other tracts already owned by the trust, at the time of the acquisition, could not be harvested for a number of years. Thus, the trust acquired the tract in order to provide income for the beneficiaries in future years. Additionally, the trust also acquired additional acres of pasturage when the purebred beef herd the trust owned had increased in number to the extent that additional pasture was needed. Moreover, most of the acquisitions of property made by the trust were financed by the trust taking out loans from the Federal Land Bank. The funds furnished by the beneficiaries, in most instances, were used in making the payments on these loans which the trust had taken out with the Land Bank. It follows from our finding, that the transactions by which decedent furnished funds to the trust were loans that there were no transfers made *603 by decedent to the Webb Trust which would cause section 2036 to be applicable. This disposes of respondent's second theory that decedent made a transfer of property in which she retained for her life the possession or enjoyment or the right to the income therefrom or that she retained the right, either alone or in conjunction with any other person, to designate the persons who shall possess or enjoy the property transferred or the income therefrom. Section 2036 (a)(1) and 2036 (a)(2). As we noted in Estate of Goetchius v. Commissioner,17 T.C. 495, 501, 505 (1951), transfers which are subject to estate tax pursuant to section 2036 are those which have the two following attributes: (1) Such transfers are regarded as of a testamentary nature and (2) cannot be considered as bona fide sales for full and adequate consideration in money or money's worth. Under the statute bona fide sales for adequate and full consideration in money or money's worth are excepted because in such instance there is no depletion of the decedent's estate. Estate of Frothingham v. Commissioner,60 T.C. 211, 215-216 (1973); *604 Estate of Goetchius,supra at 505. See also section 2043.
In the instant case, the funds were furnished to the trust as loans which the trust was obligated to repay to decedent. Therefore clearly there is no depletion of decedent's estate. [4]Section 2036 is therefore inapplicable and does not require the inclusion of any additional property in decedent's estate. The $202,975.25 indebtedness of the trust to decedent was included in the estate tax return as filed. Because of issues raised in the pleadings which were disposed of by agreement of the parties Decision will be entered pursuant to rule 155.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect at the date of death.↩
2. Respondent determined decedent had an undivided 17.27 percent interest in all assets acquired by the Webb Trust subsequently to its creation. Such percentage was apparently derived by dividing the amount of decedent's unwithdrawn trust income as of the date of her death by the net book value of the total assets of the Webb Trust. Respondent then applied 17.27 percent to the $2,001.600 amount which he determined to be the fair market value of all assets acquired by the Webb Trust subsequent to its creation and arrived at $560,778 as the amount to be included in decedent's gross estate.Since $202,975 was already included in the estate tax return, respondent seeks to include an additional $357,803 amount in the estate ($560,778 - $202,975).↩
3. Also because of our conclusion that decedent's funds retained by the trust were loans, it is unnecessary for us to determine whether the holding in First Alabama Bank of Tuscaloosa v. Webb,373 So.2d 631↩ (Ala. 1979), that decedent's interest in the trust corpus terminated at her death, encompassed properties acquired by the trust as well as the corpus placed in the trust by the settlor, on which the parties disagree.
4. On reply brief respondent expressly disavows the raising of any contention that the interest-free use of the funds itself would be a transfer under section 2036↩.